| | | |
|---|---|---|
| **RANA HAJIZADEH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 3:10-cv-00817** |
| | ) | |
| **v.** | ) | **Judge Sharp** |
| | ) | **Magistrate Judge Brown** |
| **VANDERBILT UNIVERSITY and** | ) | |
| **WONDER DRAKE, M.D.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This is an action for equitable relief and damages for unlawful employment practices brought under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"); Retaliation under the Tennessee Public Protection Act, T.C.A. § 50-1-304 ("TPPA"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.* ("Title VII") and Tennessee common law; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; and 42 U.S.C. § 1981.

Pending before the Court are Defendants' *Motions for Summary Judgment* (Docket Entry Nos. 35 and 39). Also pending is Plaintiff's *Motion for Partial Summary Judgment against Defendant Vanderbilt University* (Docket Entry No. 42). The motions have been fully briefed by the parties.

## RELEVANT FACTS

Plaintiff Rana Hajizadeh ("Plaintiff") is from Iran and worked at Vanderbilt University ("Vanderbilt") on an H-1B visa until she received her Green Card in late June 2009.[1] Plaintiff

---

[1]  Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 51, 54 and 68) and related declarations and exhibits. Based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

began her employment at Vanderbilt in July 2003 as a Research Assistant II ("RA II") in the Cancer Center working under Dr. Josiane Eid ("Eid"). In January 2005, Plaintiff interviewed with and was hired by Defendant Dr. Wonder Drake ("Drake") (collectively with Vanderbilt, the "Defendants"), to work in Drake's lab as a Research Assistant III ("RA III").[2] Drake is supervised by Dr. Richard D'Aquila ("D'Aquila"), the Director of the Infectious Disease Division. Drake's lab focuses its research primarily on exploring the etiology and pathogenesis of sarcoidosis, a disease that affects the lungs.

Initially, Plaintiff and Drake had a good working relationship, and Drake felt that Plaintiff's work performance was good. On Plaintiff's initial performance evaluation in April 2006, Drake rated Plaintiff's overall work performance 4.5 out of a possible 5.0. Drake wrote in the comments to Plaintiff's 2006 evaluation that Plaintiff's developmental goal for the upcoming year was to broaden her understanding of the sarcoidosis literature and to have more accountability for interpreting results. Over the next three years, as Drake began working more closely with Plaintiff on her research experiments, she began to notice that Plaintiff was having difficulty appraising the literature critically, determining the cause of a failed experiment, analyzing data, and working independently.

On or around August 2006, Mary Kirby ("Kirby") and Drake were notified that the Department of Labor required Plaintiff's wage be raised consistent with a prevailing wage rate determination effective January 2007. The scores employees receive on their performance evaluations directly impact the amount of their annual raises. Drake, who paid Plaintiff's salary from one of the grants she received to conduct her sarcoidosis research, was given a choice between extending Plaintiff's H-1B visa, which meant increasing Plaintiff's pay or not extending

---

[2] The only other person working in Drake's lab as an RA III, other than Plaintiff, was Xiaoyan Zhan (Chinese) from September 2007 until July 2008.

the H-1B visa, which meant no longer employing Plaintiff. Drake reviewed her budget and decided that she could afford to extend Plaintiff's visa. Plaintiff's salary was increased by approximately $2,000.00. After Plaintiff's wage was required to be raised, Drake made constant comments to Plaintiff that she was being paid too much.

In 2007, Plaintiff requested Drake's assistance with her Green Card application. Drake agreed to write a letter on Plaintiff's behalf and to have her colleagues write letters in support of Plaintiff and the research she was doing in Drake's lab. In May 2007, Plaintiff received an overall performance evaluation score of 4.0 out of a possible 5.0 from Drake.

Plaintiff's overall evaluation score dropped to 3.8 out of a possible 5.0 in March 2008. On November 10, 2008, Plaintiff received a bonus and was thanked for being a valuable member of the team. Also, in November 2008, Plaintiff learned that there were issues concerning her Green Card and she would need to take time off from work to travel to Turkey. According to Plaintiff, when she requested to use her vacation time to travel to Turkey, Drake gave her a hard time. At the end of December, Plaintiff met with Nanette Vaughn ("Vaughn"), a manager in Vanderbilt's employee relations department, and shared her concerns that Drake may deny her request for time off to travel to Turkey for her Green Card.

After notifying Drake she needed to travel for her Green Card, in December 2008, Drake assigned Plaintiff a project investigating Toll-like receptor ("TLR") cells in sarcoidosis pathogenesis. Plaintiff also contends that when Drake assigned the TLR project, she told Plaintiff that she did not expect Plaintiff to be able to successfully complete the project, which would then allow Drake to go to Human Resources and ask that Plaintiff's employment be terminated.

On January 20, 2009, Plaintiff sought assistance from D'Aquila regarding how to handle Drake with respect to her travel to Turkey on January 28, 2009. D'Aquila requested a meeting with Vaughn, Kirby and Drake on January 22, 2009, to discuss Plaintiff's alleged performance issues. The individuals met on February 4, 2009 and the following occurred:

> Dr. Drake advised of possible options. She was told to be careful and not to do anything further until Rana has returned from Turkey regarding green card and been back several weeks. It could be construed as discrimination due to green card. Dr. Drake was told to document carefully for a while and reevaluate but be careful not to discuss with HR first. Dr. Drake was told she could not refuse to let Rana go to Turkey for green card.

(D'Aquila Dep. Ex. 3).

Additionally, Drake was advised that she could not refuse to let her go to Turkey because it would cause "serious problems." (*Id.*).

On March 13, 2009, Plaintiff received her 2009 performance evaluation, which reflected an overall score of 2.4 out of a possible 5.0. On April 17, 2009, Plaintiff filed an appeal regarding the evaluation. As part of the appeal process, Vaughn met separately with Plaintiff and Drake to discuss the scores in the evaluation. During the meeting with Vaughn, Drake reviewed and revised several of the scores on Plaintiff's performance evaluation, which resulted in an increase in Plaintiff's overall score to 2.7 out of a possible 5.0.

On June 23, 2009, Drake placed Plaintiff on a written performance improvement counseling ("WPIC") for unproductive use of work time and continued poor work performance. On July 16, 2009, Plaintiff challenged the WPIC through Vanderbilt's dispute resolution process. Plaintiff's initial grievance contained allegations regarding discrimination and harassment by Drake. Plaintiff later withdrew this grievance and submitted a new grievance, this one without the allegations of discrimination and harassment. According to Plaintiff, she withdrew her initial grievance because she did not want the dispute resolution process delayed by an investigation by

Vanderbilt's Opportunity Development Center ("ODC"). The ODC is responsible for monitoring compliance with Vanderbilt's Equal Opportunity and Affirmative Action Policy and investigating employees' complaints of discrimination and harassment. Plaintiff informed Vaughn that she planned to file her complaints of discrimination and harassment separately.[3] On August 6, 2009, Plaintiff was placed on a final performance improvement counseling ("FPIC") for continued work performance problems. The Plaintiff appealed her FPIC on September 6, 2009.

Plaintiff took FMLA from June 25 – July 8, July 20, 22 and August 7, 2009 to address stress and anxiety that Drake was purportedly causing her. Defendants claim this was not the only source of stress and anxiety for Plaintiff. *See* (Docket Entry No. 68 at 11). On June 24, 2009, Plaintiff first saw her physician about the workplace stressors she was enduring. In diagnosing Plaintiff, Dr. Al-Omary ("Al-Omary") reported the crux of the workplace stress was her supervisor screaming at her and the stress Plaintiff was experiencing at the lab.

According to Plaintiff, Drake made repeated complaints in writing about her need for FMLA, by way of example:

> [7/13/09] She has two brothers and a sister who either live with or next door to her parents. There is no reason why she has to be the one to take a day off each month for their office visit. There needs to be a discussion before I approve this [FMLA approval letter]. To which Nanette Vaughn replied Mary needed to call her to discuss.

> [7/29/09 in response to Plaintiff's request for FMLA due to constant stress and anxiety] Yesterday, you came in late, and left early because you said that your tooth ached. We were supposed to meet today to go over the data. Prior to this, you did have two weeks off and your doctor signed a form that you can return to work. In order for me to remain competitive with my grants, I will need you to come to work and generate data that can be used for published manuscripts.

---

[3] Plaintiff did not file a complaint with the ODC until August 6, 2009.

[8/5/09] I have to say that I am amazed with all the [time] she took off going to Iran (twice) and these FMLA and sick days that she still has time left: Vandy must be generous.

[8/7/09] I told her that because she would be off for the next two weeks for FMLA that I needed her to come in today and at least go over her data with me, so that we could continue this work while she is gone. I mentioned that as soon as we finished going over the data, she was free to leave. Today, she sends me an email that she is sick due to anxiety from work and has a doctor's excuse, and sends an email to Kyra to make sure and turn in her timesheet. I will not stay productive if this continues. I want to dismiss her, and will speak to Nannette next week about what my options are.

[8/9/09] [Rana] faxed me a doctor's excuse that she was not coming in due to an anxiety attack secondary to work related stress. This is a serious charge and one that should have proper documentation from her physician. Rana is building up a legal case and we need to assess if she is really having these attacks. If so, she needs medical leave. If not, then she is presenting false information related to her medical condition and should be dismissed.

*See* (Docket Entry No. 68 at 13-14).

On July 28, 2009, Plaintiff wrote on her timesheet that she began work at 8:05 a.m. On Friday, July 31, 2009, at the end of the two-week pay period, Plaintiff requested that Drake sign her timesheet attesting to the accuracy of the hours listed therein. Drake did not sign Plaintiff's timesheet based on what, according to Drake, she honestly believed was a discrepancy in the time Plaintiff reported on her timesheet that she began work versus when Plaintiff, in fact, came into work. Plaintiff insists that she arrived to work at 8:05 a.m. because she looked at the clock on her desk when she arrived. Plaintiff testified that she was talking on the cell phone with her fiancé when she entered the lab. She then realized that the lab door was opened and the light was on. Plaintiff told her fiancé that she thought Drake was in the lab and that Drake's office door was cracked open and the lights were on. (Docket Entry No. 37, Plaintiff Dep. at p. 151).

Plaintiff ended the phone call with her fiancé and began making noises such as moving her chair and jingling her keys to signal that she was in the lab. Plaintiff checked her emails and

then left the lab to begin her experiments for the day at approximately 8:15 a.m. Plaintiff testified that she was in the tissue culture room doing her experiments until 11:00 a.m.

Drake recalls that on the morning of July 28, 2009, she was running a little late and did not arrive at the lab until approximately 8:07 a.m. In an email she sent to Vaughn on July 31, 2009, Drake wrote that she came into the lab at 8:10 a.m. Drake had to unlock the door to the lab and turn on the lights. The only other person at work when Drake arrived was Christa Gaskill ("Gaskill"), a Research Assistant in Drake's lab, who was eating her breakfast outside of the lab in the hallway. (Docket Entry No. 37, Drake Dep. at p. 129). When Drake entered the lab, she went to her office and began checking the emails on her computer.

Drake testified that no one else was in the lab when she arrived. Later that morning, Drake heard Plaintiff enter the lab, but she does not recall the exact time that she heard Plaintiff enter the lab. (Drake Dep. at p. 132-133). When Plaintiff entered the lab, Drake heard her talking on her cell phone but she did not see her.

When Drake discovered the discrepancy in Plaintiff's timesheet on July 31, 2009, she sent an email to Vaughn informing her of the situation and asking whether it was "worth making a big deal out of this, or [whether] should [she] just sign" Plaintiff's timesheet. Vaughn replied that Drake should not sign off on a timesheet that she has a question about and suggested that Drake meet with Plaintiff, with a witness present, and ask about the discrepancy. That same day, Drake and Kirby met with Plaintiff to discuss the timesheet discrepancy. Drake also spoke with Gaskill to determine whether she saw Plaintiff enter the lab while she was in the hallway eating breakfast. Gaskill reported that she had not seen Plaintiff enter the lab. Drake noted that Gaskill wrote on her timesheet that she began work at 8:20 a.m. that day. From this information, Drake concluded that Plaintiff came to work sometime after 8:20 a.m. on July 28, 2009.

As part of the investigation, Vaughn interviewed Plaintiff, Drake and Gaskill. Vaughn recalls that during her interview with Plaintiff, she admitted that Drake was in the lab before her. Plaintiff offered her fiancé as a potential witness, but Vaughn did not interview him as part of her investigation. Vaughn reviewed Vanderbilt's past practice with respect to employees suspected of falsification of records. Vaughn testified she discovered that Vanderbilt had terminated employees whose time sheets reflected as little as a five minute discrepancy, and that the Department of Medicine had just recently terminated another employee for falsification of overtime hours. According to Vaughn, based on her independent investigation, Vaughn supported the decision to terminate Plaintiff's employment. (Docket Entry No. 37, Vaughn Dep. at 127, 174-177).

On August 3, 2009, Plaintiff met with Sam Starks ("Starks"), Compliance Manager in the ODC to discuss Drake's alleged treatment of her. Plaintiff met with Starks again on August 6, 2009, after she was placed on a FPIC, and formally filed a complaint with the ODC. According to Defendant, Starks immediately began investigating Plaintiff's complaint. On August 13, 2009, D'Aquila and Vaughn were notified that Plaintiff had made a complaint to ODC against Drake for national origin discrimination and harassment. (Vaughn Dep. Ex. 18).

On August 28, 2009, while out on FLMA leave[4], Plaintiff wrote Vaughn and D'Aquila that she would be returning to work on September 1, 2009 and that she hoped to return to a work environment free from harassment and abuse, which had triggered Plaintiff panic attacks, anxiety and headaches caused by Drake and those who failed to remedy the issues she had raised for months. (Vaughn Dep. Ex. 20). On that same date, Plaintiff also notified Jerry Fife, head of HR, Lennon Coleman, interim chief HR officer and Veronica Coleman, Senior Director of HR, that she had suffered harassment, including threatening her immigration status, and retaliation.

---

[4] Plaintiff was on FMLA leave August 10, 2009 – August 31, 2009, to care for her mother.

(Vaughn Dep. Ex. 21). Additionally, Plaintiff informed them that she contacted D'Aquila and Vaughn in HR several times but they had not helped her. *Id.*

On September 1, 2009, Drake terminated Plaintiff's employment for falsification of time and continued poor work performance.[5]

Shortly after Plaintiff began working in Drake's lab, she was discouraged from working or recording overtime. (Plaintiff Dep. at p. 22-28). In 2009, Plaintiff first informed Vaughn that she had performed work for which she had not been compensated. Vaughn asked for an accounting of all the hours that Plaintiff claimed she worked but was not compensated. Vanderbilt paid Plaintiff for the hours listed on her accounting.[6] Plaintiff contends that the hours she gave Vaughn were just a sample, and Vanderbilt has not paid her for all hours worked. Plaintiff cannot give an accurate example of her alleged unpaid overtime hours. At one time, Plaintiff used to keep track of her overtime hours in a journal, but she no longer has the journals. When Plaintiff was asked to give an accounting of the hours she claims to have worked without compensation, Plaintiff informed Vaughn that she did not want to claim any overtime, but rather her intent was to demonstrate to Vaughn how overburdened she was with performing her job tasks.

## <u>ANALYSIS</u>

### I.     **Summary Judgment Standard**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th

---

[5]  The decision to terminate Plaintiff was made while she was on FMLA leave.

[6]  Plaintiff did not cash the check because she disputed the hours offered and was still allegedly owed overtime compensation for hours not reflected in the check.

Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   Vanderbilt's Motion for Summary Judgment

### A.  Fair Labor Standards Act Claim

Plaintiff alleges Defendant failed to pay her for overtime hours, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"). Additionally, Plaintiff alleges Defendant unreasonably delayed payment to her after she provided Defendant adequate documentation and verification of the time she worked. (Docket Entry No. 55 at 28).

Furthermore, Defendant also purportedly knew that Plaintiff had other unpaid hours but failed to follow up on those. (*Id.* at 30).

The FLSA "requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week." *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764 (6th Cir. 2006) (citing 29 U.S.C. § 207(a)(1)). The employee must prove, by a preponderance of the evidence, that she "performed work for which [she] was not properly compensated." *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (quoting A*nderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)). Once liability is proven, the employee must prove her damages through analysis of the employer's records. However, if the employer kept inadequate records, "the plaintiff's burden of proof is relaxed, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate." *Myers*, 192 F.3d at 551.

Defendant contends Plaintiff has failed to meet her burden sufficient to create an issue for trial. (Docket Entry No. 36 at 12). Defendant claims she "can offer nothing but her own speculation" as evidence of the amount and extent of overtime for which she was not properly compensated. (*Id.*). Further, Plaintiff admits that she "cannot give … an accurate example" of her purported unpaid overtime hours. (*Id.*).

Here, Plaintiff cannot survive summary judgment on her overtime claims because she has put forward absolutely no evidence showing she performed work for which she was not properly compensated. It is undisputed that once Plaintiff brought mistakes with overtime calculation to her supervisors' attention, these mistakes were remedied. Although Plaintiff claims she was not compensated for additional hours that she worked, she has submitted no evidence to the Court showing this to be the case. There is no indication in the record of the amount of overtime

Plaintiff is supposedly owed.[7]   Viewing the evidence in the light most favorable to Plaintiff, the Court concludes no reasonable fact-finder could conclude Plaintiff performed work for which she has not been properly compensated.   Accordingly, Defendant is entitled to summary judgment on Plaintiff's FLSA claim.[8]

### B.  Family Medical Leave Act Claims

Plaintiff asserts interference and retaliation claims under the Family and Medical Leave Act ("FMLA").  (Docket Entry No. 55 at 14).  Defendant claims that it had a legitimate reason for terminating Plaintiff unrelated to her FMLA leave.  (Docket Entry No. 36 at 26).

The FMLA provides eligible employees with up to "12 workweeks of leave during any 12-month period" for various reasons, including "to care for ... a ... parent, of the employee ... if such ... parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  An employee eligible for leave under the FMLA is one who has "been employed (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."   29 U.S.C. § 2611(2)(A).

The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny [ing] the exercise of or the attempt to exercise, any right provided" by the FMLA.   29 U.S.C. § 2615(a)(1).  Further, the FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).   An employee who believes her rights under the FMLA have been violated may file suit in federal court.   29 U.S.C. § 2617.   An injured

---

[7]  The Court notes that according to Plaintiff, at one time she used to keep track of her overtime hours in a journal, but she no longer has the journals.  (Plaintiff Dep. at p. 162).

[8]  Consequently, Plaintiff's *Motion for Partial Summary Judgment against Defendant Vanderbilt University* (Docket Entry No. 42) will be denied.

employee may receive damages and equitable relief for violation of 29 U.S.C. § 2615. 29 U.S.C. § 2617(a)(1).

<u>*Interference Claim*</u>

To state a *prima facie* claim of interference under the FMLA, a plaintiff must show that: (1) the plaintiff is an eligible employee; (2) the defendant is an employer covered by the FLMA; (3) the employee was entitled to FMLA leave; (4) the employee gave the employer notice of the employee's intention to take leave; and (5) the employer denied the employee FMLA benefits to which the employee was entitled. *Edgar v. JAC Products. Inc.,* 443 F.3d 501, 507 (6th Cir. 2006); *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005). "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 446 (6th Cir. 2007). An employer is thus liable for interference if it uses FMLA leave as one factor in deciding to terminate an employee. *Id.* at 448.

As Plaintiff reiterates, Drake made repeated complaints in writing about Plaintiff's need for FMLA leave. (Docket Entry No. 55 at 7). In addition, Drake refused to notify Plaintiff that she had been approved for FMLA leave, including one incident, wherein Plaintiff was required to pay an increased rate for airfare travel. (*Id.*).

The court finds that there are questions of fact as to whether Drake's discipline against Plaintiff was motivated by Plaintiff taking FMLA leave; as such, the court cannot grant summary judgment in favor of Defendant on the FMLA interference claim.

<u>*Retaliation Claim*</u>

The FMLA prohibits employers from taking adverse employment actions against employees based on the employee's exercise of FMLA leave. *Bryant v. Dollar General Corp.,*

538 F.3d 394, 401 (6th Cir. 2008). Absent direct evidence of unlawful conduct, FMLA retaliation claims are evaluated according to the burden-shifting framework used in Title VII discrimination claims. *Hunter v. Valley View Local Schools,* 579 F.3d 688, 692 (6th Cir. 2009); *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007).

To state a *prima facie* claim of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff was engaged in an activity protected by the FMLA; (2) the defendant knew that the plaintiff was exercising the plaintiff's rights under the FMLA; (3) the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian,* 454 F.3d at 556.

The Sixth Circuit has held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007). As is the case with an interference claim, employers may not "use the taking of FMLA leave as a negative factor in employment actions." *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 707 (6th Cir. 2008) (citation omitted).

Plaintiff, who was due to return to work on September 1, 2009, was terminated that same day for alleged falsification of her July 28, 2009 timesheet and performance. The decision to terminate Plaintiff was made while she was on FMLA leave.

Although, Defendant proffers evidence showing legitimate non-discriminatory reasons for its actions, there is also evidence from which a jury could conclude that there was a causal connection between Plaintiff's FMLA leave and the termination in her employment, and that Defendant's explanations are just a pretext for retaliation.

Accordingly, summary judgment is denied regarding Plaintiff's claim of retaliation under FMLA.

## C. Retaliation Claims

<u>*Title VII, 42 U.S.C. § 1981 and Tennessee Human Rights Act Claims*</u>

In the absence of direct evidence, retaliation claims are reviewed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). "To make a *prima facie* showing of retaliation, a plaintiff must show that (1) [s]he engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *Id.* "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Harris v. Metro.Govt. of Nashville*, 594 F.3d 476, 485 (6th Cir. 2010).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show a legitimate non-discriminatory reason for its action. *Abbott*, 348 F.3d at 537, 542. If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true motivation, but rather, a pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93*; see also Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 565 (6th Cir. 2004); *Penny v. UPS,* 128 F.3d 408, 417 (6th Cir. 1997).

To show pretext, Plaintiff must produce evidence that Defendant's asserted reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." D*ews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). *See also Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). In order to show that there was no basis in fact for the decision made, "a Plaintiff must put forth 'evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false.'" *Abdulnour v. Campbell Soup Supply Co. LLC*, 502 F.3d 496, 502-03

(6th Cir. 2007). In order to show that Defendant's proffered reason did not actually motivate Defendant's challenged conduct, "Plaintiff must show 'that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext or cover up.'" *Id.* at 503 (citations omitted). "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) (quoted with approval in *White v. Baxter Healthcare*, 533 F.3d 381, 393-394 (6th Cir. 2008)).

Plaintiff contends that that she was retaliated against in numerous ways, which transpired after she complained about her rights to request leave to travel and later about "discrimination," and then numerous complaints she made from 2008 to her termination. (Docket Entry No. 55 at 18).

The parties do not dispute that Plaintiff has established the first three elements of her retaliation claim. The parties dispute, however, the fourth element and the Court must determine whether Plaintiff has demonstrated a causal connection between the complaints and her termination. In order to establish a causal connection, "the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott,* 348 F.3d at 537, 543.

In this case, Plaintiff has presented sufficient evidence, which calls into question the veracity of the reasons given the series of events preceding her complaints. Defendant proffers evidence showing legitimate non-discriminatory reasons for its actions – falsification of her timesheet and poor work performance. But, there is also evidence from which a jury could

conclude that there was a causal link between Plaintiff's protected activity and the subsequent actions in her employment, and that Defendant's explanations are just a pretext for retaliation. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Reeves v. Sanderson Plumbing Prod.'s Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).  Ultimately, it will be for the jury to determine if there was a causal connection between her complaints and the consequent actions in her employment.

Accordingly, summary judgment is denied regarding Plaintiff's claims of retaliation under Title VII, 42 U.S.C. § 1981 and the THRA.

<u>Common Law and Tennessee Public Protection Act Claims</u>

It is well-settled that Tennessee recognizes the employment at will doctrine, which the "concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong."  *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 716 (Tenn. 1997).  Tennessee courts also recognize exceptions to this doctrine: "In Tennessee an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy, which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Id.* at 717.  These exceptions attempt to strike a balance between "the employment-at-will doctrine and rights granted employees under well-defined expressions of public policy." *Id.*  Thus, "the tort action of retaliatory or wrongful discharge is available to employees discharged as a consequence of an employer's violation of a clearly expressed public policy." *Id.*  To be sure, the Tennessee Supreme Court has "emphasized that the exception to the employment-at-will doctrine must be narrowly applied and not be

permitted to consume the general rule." *Id.* at 717 n. 3 (citing *Chism v. Mid–South Milling Co.,* 762 S.W.2d 552, 556 (Tenn. 1988)).

Courts often analyze common law and statutory whistleblower claims together. *See, e.g., Bright,* 2007 WL 2262018, at *3–5; *Williams v. Columbia Hous. Auth.,* No. M2007–1379–COA–R3–CV, 2008 WL 4426880, at *3–5 (Tenn.Ct.App. Sept. 30, 2008); *Moray v. Novartis Pharmaceuticals Corp.,* No. 3:07–cv–1223, 2009 WL 82471, at *7-12 (M.D.Tenn. Jan. 9, 2009); *Treadaway v. Big Red Powersports, LLC.,* 611 F.Supp.2d 768, 783 (E.D.Tenn. 2009); *Smith v. C.R. Bard, Inc.,* 730 F.Supp.2d 783, 797 (M.D.Tenn. 2010). To establish a retaliatory discharge claim under the common law, a plaintiff must prove the following:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Crews v. Buckman Laboratories Int'l, Inc.,* 78 S.W.3d 852, 862 (Tenn. 2002) (citations omitted). Tennessee courts do not "engage in hypothetical guessing to fashion public policy," nor do they "attempt to discern public policy from the common law."

*Stein,* 945 S.W.2d at 717 (quoting *Nashville Ry. & Light Co. v. Lawson,* 144 Tenn. 78, 91, 229 S.W. 741, 744 (1921) (with other citation omitted)).

In addition to a common law action for retaliatory discharge, the Tennessee Public Protection Act ("TPPA"), commonly referred to as the "Whistleblower Act," Tenn. Code Ann. § 50–1–304(a), provides that an employee shall not be discharged solely for refusing to participate in or to remain silent about illegal activities. Tenn. Code Ann. § 50–1–304(b). "Illegal activities" include activities that are in violation of state or federal criminal or civil codes or any regulation intended to protect the public health, safety or welfare. Tenn. Code Ann. § 50–1–304(a)(3). To establish a retaliatory discharge claim under the TPPA, a plaintiff must prove that (1) [s]he was

an employee; (2) [s]he refused to participate in, or to remain silent about, illegal activities; (3) [s]he was terminated by his employer; and (4) there is an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and [her] termination. *Sykes v. Chattanooga Housing Auth.,* No. E2008–00525–COA–R3–CV, 2009 WL 2365705, at *11 (Tenn.Ct.App. July 31, 2009).

Whistleblower protection is intended to remain a narrow exception to the at-will employment doctrine. *Stein,* 945 S.W.2d at 717 n. 3; *Chism,* 762 S.W.2d at 556. Therefore, in analyzing a whistleblower case, we are not limited to a determination of whether a law or regulation was violated, *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 538 (Tenn. 2002)*,* and, indeed, an employee's actions will not qualify him or her for protection merely because the employee has pointed out an illegal activity. *Franklin v. Swift Trans. Co.,* 210 S.W.3d 521, 530-31 (Tenn.Ct.App. 2006). It is the court's task to determine whether the whistleblowing activity that brought to light an illegal or unsafe practice has furthered an important public policy interest. *Guy,* 79 S.W.3d at 538. Toward that end, it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest. *Guy,* 79 S.W.3d at 538 n. 4. Furthermore, while an employee need not report suspected illegal activities directly to law or regulatory enforcement officials, *Emerson v. Oak Ridge Research, Inc.* 187 S.W.3d 364, 371 & n. 1 (Tenn.Ct.App.2005), an employee must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities. *Emerson,* 187 S.W.3d at 371 & n. 1. *Bright,* No. M2005–2668–COA–R3–CV, 2007 WL 2262018, at *3.

The first three elements of statutory retaliatory discharge are similar to the elements of the common law claim. *Bright v. MMS Knoxville, Inc.,* No. M2005–2668–COA–R3–CV, 2007

WL 2262018, at *3 (Tenn.Ct.App. Aug. 7, 2007); *Moray,* No. 3:07–cv–1223, 2009 WL 82471, at *7 (M.D.Tenn. Jan. 9, 2009); *Smith,* 730 F.Supp.2d 783, 797 (M.D.Tenn. 2010). However, "[t]he fourth element differs from the common law in that, to benefit from statutory protection, an employee must demonstrate that his or her refusal was the *sole* reason for his or her discharge." *Bright,* 2007 WL 2262018, at *3 (citing *Guy,* 79 S.W.3d at 535–37) (emphasis added).

If a plaintiff establishes a *prima facie* case under common law or the TPPA, based on direct or circumstantial evidence, showing a causal relationship between the plaintiff's refusal to participate in or to remain silent about an illegal activity and the employer's decision to terminate the employee, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its actions. *Provonsha v. Studs. Taking a Right Stand, Inc.,* No. E2007–469–COA–R3–CV, 2007 WL 4232918, at *4 (Tenn.Ct.App. Dec. 3, 2007). If the defendant articulates such a reason, the burden of proof shifts back to the plaintiff to show that defendant's proffered reasons are pretextual or not worthy of belief. *Id.* "To meet this burden, a plaintiff must show by admissible evidence either '(1) that the proffered reason has no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate the discharge.' " *Id.* (citation omitted).

Defendant contends that Plaintiff will not be able to proffer evidence that her complaints about Drake's alleged harassment and discrimination were the sole cause of her termination. (Docket Entry No. 36 at 20). Defendant further argues that "[a]ccording to Plaintiff, Defendant terminated her based on retaliation, national origin discrimination, and her age… [t]hus, not even [she] believes that her complaints about discrimination and harassment were the exclusive basis for her termination." (*Id.*).

The Court finds that Plaintiff is merely proceeding on alternative theories, and there is sufficient evidence for a jury to conclude that the reason for her termination, whether the sole or substantial factor, was related to her engaging in protected activity. Accordingly, summary judgment will be denied as to Plaintiff's retaliatory discharge claims under the TPPA and Tennessee common law.

### D. Discrimination/Harassment Claims

#### *42 U.S.C. § 1981 Discrimination Claim*

Plaintiff contends she was subjected to a "continuing and on-going campaign of discrimination in the workplace at Vanderbilt because of her alienage." (Docket Entry No. 39 at 12). The Section 1981 claim is analyzed identically to a claim brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *Newman v. Federal Express Corp.,* 266 F.3d 401, 406 (6th Cir. 2001) ("Section 1981 claims are analyzed under the Title VII *McDonnell Douglas/Burdine* frame work.").

Plaintiff has not produced any direct evidence of alienage discrimination. Therefore, in the absence of direct evidence, Plaintiff's claim is analyzed under the familiar evidentiary framework for cases based on circumstantial evidence set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). Under that framework, Plaintiff must first establish a *prima facie* case of alienage discrimination. *Id.* at 802. If she carries that burden, the burden shifts to Defendant, who must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-803. Upon Defendant's offer of a legitimate, non-discriminatory reason, the burden shifts back to Plaintiff to demonstrate that the proffered reason is pretextual, masking intentional discrimination. *Id.* at 804.

To establish a *prima facie* case of alienage discrimination under Title VII, Plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than a similarly situated employee who was not a member of the protected class, or she was replaced by a person outside the protected class. *See Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Defendant does not dispute that Plaintiff is a member of a protected class and that her employment was terminated on September 1, 2009. (Docket Entry No. 36 at 21). Defendant contends, however, that Plaintiff cannot satisfy the second and fourth elements – that she was "qualified" for the position of Research Assistant III nor that she was treated differently than a similarly situated employee who was not a member of the protected class, or she was replaced by a person outside the protected class.[9] (*Id.*).

The Court of Appeals for the Sixth Circuit has held that the Court may not consider the proffered legitimate, nondiscriminatory reason for a plaintiff's termination in its analysis of whether Plaintiff has met her burden of showing that she was qualified for the job to satisfy her *prima facie* case. *See Tysinger v. Police Dep't of the City of Zanesville,* 463 F.3d 569, 573 (6th Cir. 2006); *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 585-87 (6th Cir. 2002); *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660-661 (6th Cir. 2000). The Sixth Circuit has warned against "conflating" the two stages of the *McDonnell Douglas* inquiry, *i.e.*, the qualification prong of the *prima facie* case and Defendant's proffer of a legitimate, nondiscriminatory reason for the adverse action. *Cicero,* 280 F.3d at 584; *Cline, supra.* In other words, the Court must assess whether a plaintiff met the employer's legitimate expectations before the events leading to the adverse action. *Tysinger, supra; Cicero,* 280 F.3d at 585; *Cline,*

---

[9] Plaintiff does not make the argument that she was replaced by a person outside the protected class; therefore, the Court will not conduct such analysis.

*supra.* Typically, the Court will consider a plaintiff's past employment along with evaluations and other indicia of performance since she became employed by the defendant. Viewing Plaintiff's allegations most favorably to her, the Court is compelled to find that Plaintiff has met her burden of showing that she was qualified for her position.

To be deemed similarly-situated, the individuals with whom Plaintiff seeks comparison must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *Hughes v. General Motors Corp.*, 212 Fed.Appx. 497, 503 (6th Cir. 2007). Plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated. *Hatchett v. Health Care and Retirement Corp. of Am.*, 186 Fed.Appx. 543, 548 (6th Cir. 2006). Rather, Plaintiff and the employee with whom Plaintiff seeks to compare herself must be similar in all of the relevant aspects. *Id.*; *Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir. 2002). This means Plaintiff must prove that all of the relevant aspects of her employment situation are nearly identical to those outside of the protected class who she alleges were treated more favorably. *Hatchett*, 186 Fed.Appx. at 548.

Plaintiff purports that "because there were multiple employees in Drake's lab who worked as a team, the common denominator is Drake." (Docket Entry No. 55 at 27). Thus, "other members of Drake's lab, regardless of title are comparators." (*Id.*).

Conversely, Defendant claims none of the persons with whom Plaintiff attempts to compare herself was employed by Vanderbilt as a RA III. (Docket Entry No. 36 at 23). In fact, the only other RA III was Xiaoyan Zhan, who is Chinese. (*Id.*). Although each of these

individuals conducted research experiments similar to those performed by Plaintiff, they were not held to the same performance standard - because they were not RA IIIs. (*Id.*). Moreover, Defendant continues, Plaintiff cannot point to any U.S. citizen employee whose record contained verbal and written counselings regarding poor work performance and/or who falsified his/her timesheets, and yet was not discharged. (*Id.*).

The Court finds Plaintiff has not established the fourth element of her *prima facie* case, wherein she has failed to prove that all the relevant aspects of her employment situation where nearly identical to those outside her protected class, who she alleged were treated more favorably. *See, Hatchett*, 186 Fed.Appx. at 548. Likewise, Plaintiff's blanket statement about Drake's lab, that "other members regardless of title are comparators," fails to identify the alienage of those ostensibly "similarly-situated" to her.

Therefore, Defendant is entitled to summary judgment on Plaintiff's Section 1981 discrimination claim.

### *42 U.S.C. § 1981 Harassment Claim*

Plaintiff has also alleged that she was subjected to a hostile work environment because of her alienage. A claim of hostile work environment is actionable under Section 1981, and claims under this statute are evaluated under the same standard that is used to evaluate hostile work environment claims under Title VII. *See Long v. Ford Motor Co.,* 193 Fed.Appx. 497, 501 (6th Cir. 2006); *Frye v. St. Thomas Health Servs.,* 227 S.W.3d 595, 602 (Tenn.Ct.App. 2007).

That is, to make out a hostile-work-environment claim, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based [upon her protected classification]; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an

intimidating, hostile, or offensive working environment; and (5) there is some basis for employer liability." *Russell v. University of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008). In determining whether there is a hostile work environment, the court must consider the totality of the circumstances, including the frequency of the conduct, its severity, and the degree to which it interferes with work performance. *Harris v. Forklift Sys.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). A work environment is hostile if, from an objective and subjective perspective, the harassment is severe and pervasive enough that an "abusive" working environment is created. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000). If the hostile work environment is created by a supervisor with authority over the complaining employee, the employer is vicariously liable for the hostile work environment. *Clark v. United Parcel Service,* 400 F.3d 341, 348 (6th Cir. 2005).

Here, construing all of the facts in the light most favorable to Plaintiff, Plaintiff has raised an issue of fact as to whether she was subjected to a hostile work environment in violation of Section 1981. That is, Plaintiff testified that after notifying Drake that she needed to take time off to travel for her green card, that she was subjected to essentially constant threats from Drake regarding her employment status; Plaintiff was assigned a very complicated project; Drake began criticizing Plaintiff's job performance; and as a result, Plaintiff became sick and had to take medication for anxiety and was ultimately forced to take FLMA leave to address stress she suffered due to the workplace stressed caused by Drake.

There is evidence from which a jury could conclude that Plaintiff was subjected to harassment that was severe and pervasive enough that an "abusive" working environment was created. Consequently, Plaintiff survives summary judgment on the Section 1981 harassment claim by the slimmest of reeds.

### III.     Drake's Motion for Summary Judgment

### A.  Individual Liability Under the THRA

Plaintiff seeks to hold Drake personally liable for retaliation and for aiding and abetting retaliation.  Drake first notes that, as a general rule, the THRA, like Title VII, does not allow for the imposition of personal liability because an individual is not an employer.  However, that argument neglects to consider T.C.A. § 4-21-301(1) which makes it unlawful for "a person" to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter."  An individual can be liable for retaliation under this statute, *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 377 (Tenn. Ct. App. 2005).

Plaintiff contends that the following instances raise the inference that Drake retaliated against Plaintiff for making a complaint of discrimination and encouraged the employer, Vanderbilt, to engage in discriminatory acts and prevented Vanderbilt from taking corrective action:

- Plaintiff made multiple complaints about Drake, sent multiple emails complaining about Drake's harassment to Employee Relations, Drake's supervisor and others in an effort to get Drake to stop harassing her, to no avail;

- Vaughn was telling Drake's supervisors to ignore Plaintiff and calling Drake ostensibly to avoid a paper trail;

- Plaintiff repeatedly requested Human Resources and others to move her from Drake's department, but those requests were refused; and

- After Plaintiff complained to Drake's supervisor, Drake threatened to fire her and, the next time Plaintiff complained to that supervisor, he refused to get involved.

(Docket Entry No. 60 at 2-3).

Defendant Drake claims she cannot be held individually liable under the THRA because the actions taken by Drake about which Plaintiff complained occurred within the legitimate

26

scope of her supervisory authority. (Docket Entry No. 39 at 2). Drake further claims she never gave substantial assistance or encouragement to Defendant in any alleged discriminatory acts by Defendant and thus could not be liable for retaliation. (*Id.*).

With regard to aiding and abetting retaliation, the THRA provides that "[i]t is a discriminatory practice for a person . . . to . . . (2) [a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter." T.C.A. § 4-21-301(2). Under that statute, "individual liability may exist under the common law civil liability of aiding and abetting." *Smith v. City of Chattanooga*, 2007 WL 4374039 at *8 (Tenn. Ct. App. 2007). "The common law civil liability theory of aiding and abetting requires that 'the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts.'" Id. (citation omitted).

When the facts and inferences to be derived therefrom are construed in Plaintiff's favor, Plaintiff has presented evidence from which a jury could conclude that Drake should be held personally liable for aiding and abetting the alleged retaliation. She has presented evidence from which a jury could conclude that she thwarted Plaintiff's ability to complain and then actively participated in retaliatory conversations, which led to Plaintiff's termination. This presents a jury question since, under Tennessee law, an individual may be liable where she is a supervisor and encourages or prevents the employer from taking corrective action. *See, Harris v. Dalton*, 2001 WL 422964 (Tenn. Ct. App. 2001)(judgment in favor of supervisor not warranted where evidence taken in plaintiff's favor showed supervisor denied plaintiff's claims of harassment and urged employer to "get rid" of plaintiff); *Steele 20 v. Superior Home Health Care of Chattanooga, Inc.*, 1998 WL 783348 at *8 (Tenn. Ct. App. 1998)(judgment in favor of

supervisor not warranted where supervisor denied conduct, which was designed to cover up his actual conduct and discourage employer from taking action to remedy situation).

## <u>CONCLUSION</u>

For all of the reasons stated, the Court will grant in part and deny in part Defendant Vanderbilt's *Motion for Summary Judgment* (Docket Entry No. 35). The Court will grant the Motion with respect to Plaintiff's claim brought under the Fair Labor Standards Act as well as the 42 U.S.C. § 1981 discrimination claim. The Court will deny the Motion with respect to Plaintiff's remaining claims.

The Court will also deny Defendant Drake's *Motion for Summary Judgment* (Docket Entry No. 39) and will deny Plaintiff's *Motion for Partial Summary Judgment against Defendant Vanderbilt University* (Docket Entry No. 42).

An appropriate Order shall be entered.


KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE